TEXAS Co. *v.* WHEELESS *et al.*

(In Banc. April 10, 1939.)

[187 So. 880. No. 33562.]

Watkins & Eager, of Jackson, **W. O.** Crain and **F. T. Baldwin,** both of Houston, Texas, and **A. E. Van Dusen,** of New York City, for appellant.

**J. A. Lauderdale,** Assistant Attorney-General, and **Harry M. Bryan,** of Jackson, for appellees.

Argued orally by **W. H. Watkins, Sr.,** for appellant, and by **J. A. Lauderdale** and **Harry M. Bryan,** for appellees.

**McGehee, J.,** delivered the opinion of the court.

To aid in the accomplishment of the general plan and purpose embodied in the Social Security Act of Congress,

of August 14, 1935, chapter 531, 49 Stat. 620, 42 U. S. C. A., sec. 301 et seq., the legislatures of the various states have enacted what are known as Unemployment Compensation Acts for the benefit of those who might, under certain conditions, find themselves in a state of involuntary unemployment. Our statute, Chapter 176 of the General Laws of 1936, supplemented by Chapter 3 of the Laws of the First Extraordinary Session of 1936, and amended by Chapter 147 of the General Laws of 1938, defines the state's public policy in regard to economic insecurity due to unemployment; recognizes the necessity for appropriate action to prevent its spread and lighten its burdens; seeks to encourage employers to provide more stable employment; declares it to be the judgment of the legislature that the desired end may be attained by a systematic and compulsory accumulation of funds during the periods of employment for the benefit of those who may become unemployed through no fault of their own; and provides for the accumulation of such a fund by requiring contributions from any employing unit which has, or which may have had on or before April 1, 1936, eight or more individuals in employment under any contract of hire, whether written or oral, express or implied.

There was created under the provisions of said Chapter 147 of the Laws of 1938 the Mississippi Unemployment Compensation Commission, composed of the appellees, Leon L. Wheeless, Chairman, and his associates, charged with the duty of collecting the contributions levied thereunder and of administering the unemployment compensation fund provided for.

The contributions were required to be paid from and after April 1, 1936, with respect to the wages (which includes commissions and bonuses) payable for employment, but only when such wages are payable as remuneration for personal services under a contract of hire, which were "not to be deducted, in whole or in part, from the wages of individuals in such employer's employ."

The appellant was, at the time the Act became effective, and still is, engaged in the business of refining and selling gasoline, motor oil and other petroleum products primarily at wholesale in this state, and throughout the nation, through wholesale distributors at bulk station plants, operated by individuals, firms and corporations, under the written contract hereinafter mentioned, wherein such distributors are denominated as consignees.

These wholesale distributors of the appellant's petroleum products, to whom we shall hereafter refer and designate as consignees, for the want of better legal terminology to define their real status under the particular form of contract here involved, either own or lease in most instances the bulk station plant and its equipment; furnish at their own expense the necessary trucks, fuel and equipment used in transporting and delivering the products from the bulk station plant to their customers in making sales; employ their own helpers in carrying on the business of selling the products, having the sole right and authority to control their physical conduct in the performance of their duties; determine the number of such helpers to be employed; fix and pay their wages; direct as to the portion of the working hours of these helpers that is to be devoted to the business of distributing these products and as to what portion of their time is to be employed in performing services in connection with any other lines of business in which the consignee may be engaged.

None of these consignees—forty-one in number in this State—have as many as eight individuals in employment; and the Legislature having determined, by the provisions of the statute under consideration, that when an employing unit has less than this number in its service, the discontinuance of their employment would not be a menace to economic security, it results that the contributions demanded of appellant could not be required by the Unemployment Compensation Commission in this case without it first being held that all of these consignees were

employees of such alleged consignor within the meaning
of the Act. The Commission so held; and consequently,
levied the contributions against appellant to be computed
upon the basis of the commissions paid by the alleged
consignor to its consignees, and also on the wages paid by
the consignees to their helpers, on the theory that the
helpers employed by the consignees were likewise em-
ployees of the appllant.

Thereupon, appellant brought this suit in equity; made
the consignment contract an exhibit; tendered the max-
imum amount that could be required of the complainant
in any event under the statute (to avoid the payment of
fines and penalties thereby imposed for a failure to do
so); and sought an injunction to prevent the Commission
from paying the tendered amount into the State Treasury
or levying further contributions pending an adjudica-
tion by the court as to the applicability of the Act and
a decision as to whether the sum tendered should be
returned to the complainant in such suit. From a decree
sustaining a demurrer and dismissing the bill of com-
plaint, this appeal is prosecuted.

There is therefore presented for consideration on this
appeal the proper construction and application to be
given certain language contained in the Unemployment
Compensation Act here involved, relating to and defining
"Employer," "Employment" and "Wages."

Paragraphs (h), (i), and (n) of Sec. 16 of Chap. 147
of the Laws of 1938, which amends Sec. 19 of Chap. 176
of the Laws of 1936, respectively define these terms as
follows:

"(h) 'Employer' means: Any employing unit which
. . . has or had in employment, eight or more in-
dividuals . ."

"(i) (1) 'Employment' . . . means service . . .
performed for wages or under any contract of hire,
written or oral, express or implied."

"(n) 'Wages' means all remuneration payable for
personal services, including commissions and bonuses
. . ."

Paragraph (h), as will be readily seen, presents no difficulty in this case except as to the words "in employment." The word "Employment," however, in paragraph (i), in so far as it is defined to mean "service" is easily understood, because we know what service is and that the consignees and their helpers were engaged in rendering service for someone. Also, the term "service . . . performed for wages" is clearly defined in paragraph (n), since the word "Wages" is therein declared to mean "all remuneration payable for personal services, including commissions and bonuses," unless it may be said that the words "personal services" may be difficult of application in determining whether the relation of employer and employee exists within the meaning of the Act, since insurance agents, attorneys, factors, commission merchants, automobile salesmen of cars shipped on consignment and many others render contemplated personal services who are not employees under the terms of the Unemployment Compensation Acts of the various states or the Federal Social Security Act, heretofore mentioned. Then too, services are not restricted to manual labor in order to come within the meaning of the Act, because it is therein stated, par. (q), that the term "employee" or " 'individual in employment' " includes any officer of a corporation who may be employed, that is to say whose time and physical conduct is controlled or is subject to be controlled in the performance of his duties by the alleged employer.

The decision, therefore, of the issue involved on this appeal must turn on the point as to whether under paragraph (i), supra, there was employment by appellant of the consignees and their helpers—meaning service, performed for wages, including commissions and bonuses —or under any contract of hire, written or oral, express or implied. The case is solvable on the legal meaning of that term "contract of hire," as used in the Act. A man hired to labor is employed, but a man may be employed in a work who is not hired. To "employ" is a word of more

enlarged significance than the word to "hire." Black's Law Dictionary (2 Ed.), page 572. However, in the statute now before us, the Legislature saw fit to say under the sub-head of Definitions of terms, that the employment contemplated was "service . . . performed for wages or under any contract of hire" instead of contract of employment. From the whole context we think it clear that the service which was to be performed for wages in the ordinary sense was to be under a contract of hire, and that if the compensation was to be paid in salaries or commissions it was likewise to be payable for services rendered under a contract of hire. But for the purpose of this decision we need not give to the term "contract of hire" a technical legal meaning, as distinguished from a contract of employment, but shall assume, as we should, that the Legislature used the words "Employer" and "Employee" in their usual and ordinary sense, and that this was done with a view of giving effect to the declared public policy contained in the Act, for the relief of unemployment, as hereinbefore set forth; and, from this premise, determine whether the consignees and their helpers were employees of the appellant in the ordinary sense in which the term is commonly used in the decided cases.

It first becomes necessary to ascertain whether or not the relation of master and servant existed as between appellant and its consignees and between appellant and the helpers employed by its consignees, since it is unquestionably true that if that relation existed the appellant would be liable, and admittedly so, for the contributions demanded. Appellees contend that the contributions are collectible from appellant on the basis of the existence of that relationship, and the court below adopted that view; whereas, the appellant contends that neither was such relation created, nor does any other exist under the contract such as would render appellant liable for the contributions levied against it by the Commission under the alleged authority conferred by the Act.

As to whether the bill of complaint stated ground for equitable relief, we must look not only to the contract, filed as an exhibit, but to all of the allegations of the bill of complaint, when not inconsistent with, nor contradictory to, the exhibit itself.

The contract is quite lengthy, and we shall only state the substance of its pertinent provisions. It provides that the consignee shall diligently market and distribute the petroleum products supplied by the consignor; promptly and correctly account for consignor's money, goods, products, etc.; sell the products for cash, or on credit properly authorized, and not exchange them for other property for private use; shall not sell for less than consignor's authorized prices, nor enter into any secret agreement with any customer or competitor to reduce the price, etc.; must not retain any money of the consignor; shall bear all expenses in connection with the operation of the bulk station plant and in the sale and delivery of the products to the consignee's retail customers, including the expense of furnishing the trucks and other equipment used for that purpose, such trucks and equipment to conform to consignor's standards therefor; shall hire at his own expense and pay the wages of all assistants and employees required for the proper and diligent operation of the bulk station plant and the distribution of the products, and assume full direction and control over and responsibility for the acts of all such assistants and employees, etc.; shall furnish a fiduciary bond for the faithful accounting of all money and other property of the consignor; shall not assign the contract without the written consent of the consignor; shall be entitled to the commissions set forth in the contract on the sales made of the products; that the contract shall continue in force until terminated by either party on five days' written notice; that the title of the products covered by the contract shall remain in the consignor until sold; that in the event of the termination of the contract the consignor shall have the right, for a period not to exceed three

months, to use the consignee's storage facilities located at consignee's bulk station plant, so as to enable consignor to replenish the stock, sell and deliver the products from the premises, and to remove at the end of that period any left on hand, upon paying a certain rent per month to the consignee for the time during which such facilities are so used; and finally, that in the event of the termination of the contract the consignee shall not engage in the sale of petroleum products within a radius of a given number of miles from a designated city for a stated period of years.

As will be readily perceived, all of the provisions of the contract are such as would be implied by law, in the absence of express stipulations, in any agreement whereby one sells the goods of another as a consignee, factor, commission merchant or otherwise, on commission, except those provisions to the effect that: (a) the trucks used in making deliveries shall conform to the consignor's standards, (b) that the consignee shall furnish a fiduciary bond, which is a provision usually agreed upon in such trust relationships, (c) that the consignor may have the use of the storage facilities and premises for a certain length of time, after the termination of the contract, but which stipulation does not take effect until after the relationship, whatever it may be termed, shall have expired, and (d) the restrictive covenant in regard to the consignee not engaging in the same business in the stated area, and which provision, although never implied in a contract of any nature whatsoever, may be inserted by the parties by an express agreement to that effect, as is frequently done in contracts wholly foreign to the relation of master and servant. Moreover, whether enforceable or not except when the contract is terminated for good cause, this covenant does not confer upon the consignor the right to control the physical conduct of the consignee in the performance of his duties under the contract. Therefore, the only expression found in the contract that would tend to reserve any substantial con-

trol even over the means to be employed by the consignee incident to a relationship of master and servant, as distinguished from those provisions common to the other relationships heretofore referred to, is the requirement that the trucks shall conform to the consignor's standards. That provision, however, was expressly held in the case of Cook v. Wright, 177 Miss. 644, 171 So. 686, 690, not to change the relation of an independent contractor to that of master and servant, wherein Cook (who sub-let his contract with the State Highway Department to Broadfoot) was entitled under the sub-contract to require Broadfoot to furnish trucks, the beds of which were to conform to the requirements of the Highway Department; to require the same to be kept in proper repair; to require them to be operated by competent drivers; and to require the loading, hauling and distributing of gravel to be done under the inspection at all times of the agents and representatives of the said Department, and to the complete satisfaction of its engineer, was held not to be the employer of the laborers working for Broadfoot. Both Cook and Broadfoot were declared to be independent contractors, the court saying: "It is entirely competent and proper to require the use of described instrumentalities and tools when the requirements bear a reasonable relation to the promotion of efficiency and expedition and that these shall be operated by competent employees, so long as the control of these instrumentalities and tools and employees shall remain as to the details of the physical use and conduct thereof, in the hands of the contractor. The contracts above quoted are those of an independent contractor, and not of master and servant." To the same effect is the case of Casement v. Brown, 148 U. S. 615, 13 S. Ct. 672, 37 L. Ed. 582.

Upon an examination of other decisions of our Court on the question, it will be found that subsequent to the decision of the case of Gulf Refining Company v. Nations, 167 Miss. 315, 145 So. 327, which dealt with a tort action and involved the construction of a contract similar, in

many of its essential features, to the one here under consideration, including the right to terminate the contract on short notice, but in which case the oil company furnished the bulk station plant and its equipment, and both of which provisions were influential factors in the conclusion reached, as is disclosed by the opinion, the Court decided the case of Texas Company v. Mills, 171 Miss. 231, 156 So. 866, 869, wherein the contract contained the same provisions, but in the latter case the decision was predicated upon the fact that the duties of the distributor in that contract were expressly fixed by "the rules and practices of the company, and by instructions issued . . . from time to time," the distributor being required by the contract itself "to 'strictly observe and obey the company's instructions' " in the performance of his duties. The Court there applied as the real test whether the alleged servant's physical conduct in the performance of the service in the affairs of his employer is controlled or is subject to the right of control by the alleged master; and held that the foregoing quoted provisions of the contract subjected "him to the appellant's control with respect to his physical conduct in the performance of his duties," citing Singer Mfg. Co. v. Rahn, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440. The Court also declared in the Mills case, supra, that: "The words 'independent contractor' are used in contrast with the word 'servant' and not with the word 'agent;' for both an independent contractor and a servant are agents of their principal," citing Rest. Agency, Sec. 2, comment b; 1 Mechem on Agency (2 Ed.), Sec. 40. Next thereafter, the case of Shell Petroleum Company v. Linham, Miss., 163 So. 839, not reported [in State Reports], was before the Court, wherein it was held that a provision in a lease contract, between the oil company and H. T. Young, of a lot and gasoline filling station (where lessee was obligated to purchase and handle the oil company's petroleum products), to the effect that the contract could be cancelled by either party, with or without cause, on

ten days' notice, was not controlling in determining whether Young was an independent contractor or a servant. The Court later held in the case of Texas Company v. Jackson, 174 Miss. 737, 165 So. 546, where the distributor owned the bulk station plant and its equipment, as was not true in the Nations case, that the fact as to whether the distributor or the oil company owned the instrumentalities, tools, and place of work is not controlling in determining whether the distributor was an independent contractor or a servant, but is of evidential value only. In that case the distributor was held to be a servant, but it was so held for the same reason as in the case of Texas Company v. Mills, supra, the contracts being identical except for the fact in the Mills case that the oil company owned the bulk station plant and its equipment, whereas in the Jackson case the distributor owned them as aforesaid, the Court again applying the test in the Jackson case when holding the distributor to be a servant that his physical conduct in the performance of his duties was controlled, or was subject to the right of control, by the oil company by reason of the provisions contained in that contract hereinbefore quoted from the contract involved in the Mills case. Those provisions have been deleted or omitted from the contract under consideration in the case at bar. Nor does this contract contain the provisions found in the one involved in the case of Louisiana Oil Corporation v. Renno, 173 Miss. 609, 157 So. 705, 98 A. L. R. 1296, requiring the distributor to devote his entire time and energy to the sale of the consignor's products and to employ helpers or assistants only who meet the approval of the consignor oil company.

Likewise, in the more recent cases of Cook v. Wright, supra; Crosby Lumber & Mfg. Company v. Durham, 181 Miss. 559, 179 So. 285, 854; Rest. Agency, Sec. 2, and comment b; Rest. Agency, Sec. 220, and comment c; the test as to who is a servant is stated to be whether the service is rendered by one whose physical conduct, time and activities in the performance of his duties are controlled,

or are subject to the right of control, by the alleged master under the contract of employment or hire. Under this test, which we deem to be the correct one, the relation of master and servant does not exist under the contract now being construed. It seeks merely to promote the accomplishment of the result desired, but does not in any manner (such as would be controlling on the question of whether there exists the relation of master and servant), either attempt to control the details of the work or prescribe the means by which the service is to be performed (with the exception that the trucks used in the distribution of the products must conform to the consignor's standards, a requirement discussed in the cases of Cook v. Wright and Casement v. Brown, supra, and held not to be controlling); nor does it attempt to control the physical conduct of the consignee in his operation of the bulk station plant or that of his helpers in the performance of their work.

It is true that a distributor or consignee of petroleum or other products may under some circumstances become the agent or servant of an oil company or other consignor, so as to render the consignor liable for his torts; and this is likewise true of the employees of such distributor or consignee. If, when discharging their duties which the distributor or consignee owes to the consignor, they should become subject to the oil company's or other consignor's control as to the details of their work and their physical conduct in the performance of their duties, they would be, for the time being, when discharging such duties, the servants of the oil company or such other consignor, as the case may be. Rest. Agency, Sec. 517, and comment a. For a statement of the conditions under which this may be, see Rest. Agency, Sec. 227, and comments thereunder; also, Texas Company v. Mills, supra, where it was said: "It may be true that Duncan's [he being the distributor or consignee] employees remained his servants, but, as hereinbefore stated, when he placed them in the service of the appel-

lant, they became also its servants and thereby became entitled to all of the rights of a servant against the appellant (Rest. Agency, sec. 517), except the right to payment for their services, that obligation remaining with Duncan.'' That is to say, the servant of Duncan was entitled to recover for an injury sustained at a time when he was under the control of and in the service of the oil company. If not entitled to recover the wages for his services from the oil company, would he be its employee within the meaning of an Unemployment Compensation Act requiring employers to provide a fund for taking care of their employees when thrown out of general employment? By analogy, the obligation to pay the wages of the helpers of the consignees under the contract now before us being upon the consignees themselves, as held in Texas Company v. Mills, supra, then why should they not be the ones required to contribute to the creation of the fund for their relief in the event of their involuntary unemployment? Upon what theory would the Legislature have sought to impose the obligation for the care of employees who may become unemployed upon some one who is under no obligation to pay their wages during the period of their employment? If it be suggested that unless they are held to be employees of the appellant there will be no one to make contributions to the Unemployment Compensation Fund on their behalf, since the consignees here involved have less than eight individuals each in their service, the answer is that these helpers of the consignees are in no different situation than all other employees throughout the state and nation who work for employers having less than eight in their organization's employment.

It will be readily conceded, therefore, that the only basis upon which such liability may rest, if at all, is the theory that the consignees themselves are employees of the appellant—that is to say, not merely performing personal services for wages (including commissions and bonuses) as the term ''wages'' is defined in paragraph

(n), Section 16, of Chapter 147 of the Laws of 1938, but also under a contract of hire as contemplated by paragraph (i) thereof. The inquiry, therefore, recurs to the question as to whether the contract in issue is one of hire, within the purview of the Act here under consideration.

Although not a controlling or decisive factor in determining whether the appellant is liable for the contributions levied against it by the Unemployment Compensation Commission for the benefit of the consignees of its products, for the purpose of enabling them to participate in the Unemployment Compensation Fund in the event they should be thrown out of employment by the termination of this contract, it may, nevertheless, be helpful (in view of the public policy of the State in pointing out the objects of its solicitude in the enactment of the statute, as such policy is interpreted in the case of Tatum v. Wheeless, 180 Miss. 800, 178 So. 95; also Steward Machine Company v. Davis, 301 U. S. 548, 57 S. Ct. 883, 890, 81 L. Ed. 1279, 109 A. L. R. 1293, construing the Federal Social Security Act, hereinbefore cited, which contains in substance the same definitions of the words "Employer," "Employment" and "Wages" as are found in said Chapter 147 of the Laws of Mississippi of 1938, and where this Court said in the Tatum v. Wheeless case that [180 Miss. 800, 178 So. 102] : "It is well known that many persons employed have not the prudence and ability, and foresight to provide in advance, if left to their own initiative, for need in times of stress and unemployment. They are usually employed at a wage that barely meets the needs of current living expenses; they have but little power to control what compensation they shall receive for their labor, and usually have not the means to withstand unemployment for any considerable length of time without suffering for the necessities of life;" and where it was said by the United States Supreme Court in the Steward Machine Company v. Davis case that: "During the years 1929 to 1936, when the country was passing through a cyclical depression, the number of the unem-

ployed mounted to unprecedented heights. Often the average was more than 10 million; at times a peak was attained of 16 million or more. Disaster to the bread-winner meant disaster to dependents. Accordingly the roll of the unemployed, itself formidable enough was only a partial roll of the destitute or needy. . . . The problem had become national in area and dimensions. There was need of help from the nation if the people were not to starve," that we look to the fact that the bill of complaint in the case at bar alleges as a fact, and consistent with the terms of the consignment contract made an exhibit thereto, and which allegation of fact is admitted by the demurrer, that all of these consignees are people of substantial means, having large sums of money, amounting to several thousand dollars of their own private capital, invested in the storage facilities at the bulk station plants, and in the equipment used in handling and distributing the petroleum products to their retail trade; that many of them also own the land and buildings on which the bulk station is located, while many lease the same and own the storage facilities and all equipment used in the business; that in many instances the consignees are firms or corporations—certainly not contemplated by the Act as objects of its bounty—and that most all of them are engaged in other business activities, such as that of automobile sales agents, hardware and undertaking establishments, cotton merchants, hotel operators, real estate and timber dealers, drug store operators, and other lines of business, to which both they and their helpers devote much of their time, and in which separate businesses the consignees, in many instances, have even greater capital invested than in the business of handling, distributing and selling of appellants' products. In other words, they are capitalists, investors and employers, instead of men whose services are to be had for hire.

While the Act does not limit or restrict its benefits to those only who are without means, when losing their em-

ployment, nevertheless, the well known fact that only those with a large amount of capital to invest are able to secure and finance one of these contracts as a wholesale distributor or consignee of petroleum products in this State, should be an important consideration in determining whether the Legislature intended to treat those of their class as being employed under a contract of hire, and entitled to participate in an Unemployment Compensation Fund to the extent of the meagre amount of relief per week provided for by the Act.

The status of wholesale distributors or consignees of petroleum products and that of their helpers as employees, either within the meaning of the said Federal Social Security Act or the Unemployment Compensation Acts of the various states, has not been judicially determined in any case cited by counsel. The Supreme Court of Colorado passed upon the relationship of general, district and special insurance agents, to an insurance company, and held them to be employees within the purview of the Colorado Unemployment Compensation Act in the recent case of Industrial Commission v. Northwestern Mutual Life Insurance Company, 88 P. (2d) 560, not yet reported [in State Reports], where the selection and appointment of the district and special agents was subject to the approval of the company; where they were held to be under the general control of the company by its "Rules and Instructions" made a part of each contract, and governing their relations with the company and containing limitations on the freedom of the agents in the performance of their duties; and where the power to terminate the contract was, within itself, held to involve the right of control. Our Court, however, held the contrary in the case of Shell Petroleum Company v. Linham, supra, as to the power to terminate the contract at will. Moreover, the Act expressly included any insurance company or corporation which has in its employ one or more individuals performing services for it within the State, and for that reason the Court seems to have

held that the burden was upon the insurance company to prove that it was not liable for this excise tax. There are other features of the case which render it inapplicable as an authority in the instant case. The United States Bureau of Internal Revenue held the contrary as to these agents of the same company, as did likewise the Commissions of approximately twenty states with reference to their state Unemployment Compensation Acts.

However, the question of who is an employee under Workmen's Compensation Acts has received the consideration of the courts of a number of states, but those decisions also are neither controlling nor particularly helpful here, (1) because of the lack of uniformity in the conclusions reached as to the relationship of distributors of petroleum products and their helpers to the oil companies under contracts similar to the one here involved, and (2) because the courts of those states having Workmen's Compensation Acts are obligated to give them a liberal construction so as to include within their benefits all alleged employees reasonably comprehended by their provisions. This is likewise true in regard to the departmental constructions and administrative rulings heretofore issued by the various states on the question here involved. They too, as a matter of precaution, decide in favor of the applicability of the Unemployment Compensation Acts wherever there may be any room for doubt as to its application; and the opinions and rulings of these various State Unemployment Commissions are likewise in conflict and somewhat evenly divided. Moreover, the Act here in question imposes the contributions on an employer as an excise tax. The Federal Social Security Act, Sec. 901, 42 U. S. C. A., Sec. 1101, so defines it, and the United States Supreme Court so construes it in the cases of Steward Machine Company v. Davis, 301 U. S. 548, 57 S. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293, and Helvering v. Davis, 301 U. S. 619, 672, 57 S. Ct. 904, 81 L. Ed. 1307, 109 A. L. R. 1319. And, being an excise tax, every doubt as to its application here must

be resolved in favor of appellant and against the taxing power. Planters' Lumber Company v. Wells, 147 Miss. 279, 112 So. 9; Ex parte Taylor, 58 Miss. 478, 38 Am. Rep. 336; Vicksburg & M. Railroad Company v. State, 62 Miss. 105; Bell v. Kerr, 80 Miss. 177, 31 So. 708; Wilby v. State, 93 Miss. 767, 47 So. 465, 23 L. R. A. (N. S.) 677; Bluff City Ry. Co. v. Clarke, 95 Miss. 689, 49 So. 177; State v. Grenada Compress Company, 123 Miss. 191, 85 So. 137; Sperry & Hutchison Co. v. Harbison, 123 Miss. 674, 86 So. 455. It is also necessary that we should keep in mind that in construing a statute it must be assumed that the Legislature employed the words of the statute in their usual and ordinary sense, unless it clearly appears that they were intended to be used otherwise and to convey a different meaning. State v. J. J. Newman Lbr. Company, 103 Miss. 263, 60 So. 215, 45 L. R. A. (N. S.) 858; Town of Union v. Ziller, 151 Miss. 467, 118 So. 293, 60 A. L. R. 1155; Warburton-Beacham Supply Company v. City of Jackson, 151 Miss. 503, 118 So. 606. To hold that every person rendering personal services for a compensation of any kind (including commissions and bonuses) is an employee of the person who receives a benefit, directly or indirectly, from the service, would mean that every automobile salesman to whom cars are shipped on consignment for sale on commission, as well as his helpers at the place of business of the sales agency, all of whom give their personal attention to the handling and sale of the cars, would be deemed employees of the factory corporation; that every consignee of farm implements for sale on commission as a small merchant, giving his personal attention and services to the sales, would be an employee of the wholesaler or manufacturer; and that every attorney retained by several clients and who receives a volume of business sufficient to require the services of as many as eight employees, including assistant attorneys, law clerks, and stenographers, would be an employee of each client, and likewise would his said employees, because of the fact that such retained at-

torney is to give his personal services to the handling of the business intrusted to him. We cannot attribute to the law-making power such an unreasonable intention in saying that "employment" means "service performed for wages" (including commissions and bonuses), and that "wages" means "remuneration payable for personal services." We must inevitably look, therefore, to the meaning of "under any contract of hire" for a solution of the question at issue. We do not think that "contract of hire" within the meaning of the Act includes a contract such as the one here being construed, but that it embraces, and was intended to embrace, only those who are under the control and direction of the alleged employer in the performance of the details of their work and in the use of the means employed. Such was the meaning of the term "employee" under a contract of hire at common law, and this definition has been followed in the judicial precedents contained in the decided cases. It is presumed to have been employed in this sense in the present statute.

Reversed and remanded.