THE TEXAS COMPANY, PROSECUTOR, v. NEW JERSEY UN-EMPLOYMENT COMPENSATION COMMISSION, BOARD OF REVIEW OF THE NEW JERSEY UNEMPLOYMENT COMPENSATION COMMISSION, FRANKLIN M. RITCHIE, CHAIRMAN, ISABELLE M. SUMMERS, AND M. METZ COHN, CONSTITUTING THE BOARD OF REVIEW OF THE NEW JERSEY UNEMPLOYMENT COMPENSATION COMMISSION, AND FRANK M. HANDELONG, RESPOND-ENTS.

Submitted October 2, 1944—Decided January 8, 1945.

Before Justices BODINE and PORTER.

For the prosecutor, DeVoe Tomlinson (Albert E. Van Dusen, of the New York bar, of counsel).

For the respondent Board of Review of the Unemployment Compensation Commission, Clarence F. McGovern.

For the respondent Unemployment Compensation Commission, Charles A. Malloy.

The opinion of the court was delivered by

PORTER, J. The respondent, Board of Review of the Unemployment Compensation Commission, awarded unemployment

compensation to respondent, Frank M. Handelong. Its determination is before us for review on *certiorari*.

The facts are not disputed. Handelong was employed by R. F. & R. L. Height, a partnership having two places of business. One was in New Brunswick in premises rented from the prosecutor, The Texas Company, where it sold gasoline and other petroleum products furnished by the prosecutor, automobile tires, tubes and accessories of the Firestone Tire & Rubber Company, anti-freeze mixture of the DuPont Company, electric products of the General Electric Company, fuel oil of the Royal Petroleum Corporation, radios, heaters, refrigerators, &c. The goods it sold of the Texas Company, the Firestone Company and the DuPont Company were all furnished by these companies under consignment agreements. The other place of business of the partnership was six to seven miles away in Middlesex Borough where an automobile service station was conducted, and gasoline, oil, grease and refreshments were sold. The partners had an investment in both businesses of about $14,000 consisting of three automobile oil tank trucks, one auto truck for general delivery purposes, stock of merchandise, fixtures and other equipment. Both partners, father and son, devoted all of their time and efforts to the business and in addition had six or seven employees. Handelong was employed from March, 1938, until November 16th, 1940, when he was discharged. The partnership employing less than eight persons was not subject to the provisions of the Unemployment Compensation Act, *R. S.* 43:21, *et seq.* Handelong claimed benefits under the statute, however, on the theory that the prosecutor was liable under *R. S.* 43:21–19 (g), the so-called contractor-subcontractor "tacking" clause. The Board concluded that the quoted section applied and that Handelong was entitled to compensation. It rested its decision on this section and on *Singer Sewing Machine Co.* v. *New Jersey Unemployment Compensation Commission*, 128 *N. J. L.* 611; *affirmed*, 130 *Id.* 173. It also seemed to indicate in its opinion that prosecutor might also be the employer of Handelong, because the partnership was its agent under the consignment agreement

and was in reality employed by it, and hence its employees were also. The pertinent parts of the Board's decision follow:

"It is agreed between all parties, at the outset, that claimant was an employee of the partnership and that he was not a servant or employee of the gasoline company within the common law meanings of the terms.

"Had the partnership employed eight or more individuals in twenty different weeks within a calendar year, no question would arise. The claimant would unquestionably be eligible for benefits. However, the partnership did not possess the requisite employment experience, so the claimant—in order to establish eligibility for benefits—invokes another section of the statute, namely, *R. S.* 43:21–19 (g), the so-called contractor-sub-contractor 'tacking' clause.

"In effect, the claimant asserts that although he was not an employee of the gasoline company in the common law sense, he must be regarded as its employee *for the purpose of determining benefit eligibility* because his employer was a contractor for employment in the usual course of the gasoline company's business, within the meaning of section 19 (g).

"We believe that the decision of the Supreme Court in *Singer Sewing Machine Co.* v. *New Jersey Unemployment Compensation Commission,* 128 *N. J. L.* 611, substantiates his claim with respect to that portion of his time which was devoted to handling the gasoline company's products although he is not to be regarded as an employee of the primary suppliers of tires, accessories and fuel oil. * * *

"The partners clearly were agents of the gasoline company for the furtherance of its business and were so recognized by the contract since they were specifically 'appointed' by the company to 'diligently market and distribute' its products. Since they were subject to control, we can go even farther and hold that the partners were actually employees of the company, just as Di Perna was an employee of the Singer Company; but the mere fact of their agency makes section 19 (g) applicable."

This matter was heard in the first instance by an appeal examiner of the Appeal Tribunal of the Commission. His decision was that Handelong was not eligible for unemploy-

ment compensation benefits because he was not employed by prosecutor but by the partnership and that the consignment agreement between the prosecutor and the partnership was not a contract for any employment within the meaning of section 19 (g) of the statute. Thereafter, the Board withdrew the case from the Appeal Tribunal and issued an order to the prosecutor to show cause why the decision should not be reversed. The Board heard argument on the evidence taken before the Appeal Tribunal and reversed the decision by a vote of two to one.

We are not unmindful of the fact that the beneficent object of this statute is to minimize loss to workers by unemployment compensation benefits. We may not accomplish that desired result, however, by extending the application of the statute to factual situations not covered by its provisions. We think the conclusions reached by the Appeal Tribunal and by the dissenting member of the Board under the conceded facts to be the right answer to the question presented and that the decision under review should be reversed.

The consignment agreement between prosecutor and the Heights in substance is that the Heights are obligated to diligently market and distribute petroleum products of the prosecutor at prices and credit terms fixed by prosecutor and are to be paid specified commissions on such sales; that all goods and proceeds from sales shall be promptly accounted for; that title to the unsold goods shall remain in prosecutor; that the Heights shall bear all the expense of conducting the business, furnish all equipment needed, furnish all help and assume full direction and control over all employees and pay all contributions for workmen's compensation and unemployment insurance respecting such employees. Nowhere in this contract is there any obligation on the part of the Heights to devote all of their efforts to the sale of the products of prosecutor; nor is there any restriction as to what other goods they may sell or how they should conduct their business. They are not obligated to sell any specified quantity of prosecutor's goods. The agreement expressly provides that the Heights would hire and pay all employees needed and would assume full direction and control over them. Prosecutor was

under no duty to them or to the Heights for any expenses of the business. Handelong was hired and paid by the Heights, and there certainly was no employer and employee relationship between prosecutor and him. His duty was to carry out the instructions of his employers, the Heights. His work was varied, and it was impossible to show how much of his time was used in selling or delivering goods of the prosecutor. Indeed, for some time he was engaged almost exclusively at the automobile service station and had little to do with the sale or delivery of prosecutor's goods. It is true that in dollars the sale of prosecutor's goods by the Heights constituted a large percentage of their business. We do not think, however, that this fact is controlling. We find no design or purpose in the provisions of this agreement to effect an illegal object or to be against public policy. They were within their rights to contract freely as suited their wishes. *Cf. Fenwick* v. *Unemployment Compensation Commission*, 132 *N. J. L.* 185.

*R. S.* 43:21–19 contains many definitions of words and phrases used in the statute. The definition of "employing unit" with which we are concerned is found in paragraph (g). The pertinent part is as follows:

"Whenever any employing unit contracts with or has under it any contractor or subcontractor for any employment which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of subsection (c) of section 43:21–8 of this Title or subsection (h) of this section, the employing until shall for all the purposes of this chapter be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such employment; except that each such contractor or subcontractor who is an employer by reason of subsection (c) of section 43:21–8 of this Title or subsection (h) of this section, shall alone be liable for the contributions measured by wages payable to individuals in his employ, and except that any employing unit who shall become liable for and pay contributions with respect to individuals in the employ of any such contractor

or subcontractor who is not an employer by reason of subsection (c) of section 43:21–8 of this Title or subsection (h) of this section, may recover the same from such contractor or subcontractor * * *."

It will be noted that this statute does not include every contract within its provisions. It specifically retricts contracts with "any contractor or subcontractor *for any employment* which is part of its usual trade, occupation, profession or business." Section 19 (i) (1) of this statute defines the term "employment" as "service, including service in interstate commerce performed for remuneration or under any contract of hire, written or oral, expressed or implied." "Remuneration" is defined in section 19 (p) as "all compensation payable for *personal* services, including commissions and bonuses," &c. It seems to us, therefore, that the kind of a contract contemplated and meant by the statute must be one for work or services which would ordinarily be performed by an employee, but which is being farmed or contracted out. The contract between prosecutor and the Heights was for their mutual advantage in the sale and distribution of the products of prosecutor and was not intended to be, nor was it in fact, a contract "for any employment" as intended or defined by the statute. It was selling goods by a certain method well recognized and customary in merchandising businesses. It provided for the payment of commissions for the sale of goods but was not a contract for "personal" services as meant by the statute. Prosecutor was not interested in whom the Heights employed, what wages were paid or hours or conditions of employment, nor did it control or supervise its business in any way or have any right to do so. It was, of course, interested in the sale of its products and to that end furnished a manual of helpful suggestions respecting selling and accounting methods and the proper storage of goods, &c. These, however, were merely suggestions, and it was entirely optional whether or not the suggestions were followed.

The point made in the decision under review that the Heights as distributors were appointed by prosecutor to diligently market and distribute its products and were therefore

subject to control by prosecutor, and that the partners were actually employees of prosecutor, seems to us to be without merit. What prompted this agreement, we do not know, nor is it important which of the parties sought the relationship. We are only concerned with the interpretation of the agreement, and we perceive nothing in it which can be construed to mean that the Heights are subject to control by prosecutor or that either they or their employees are actually or implicitly in the employ of prosecutors. True, they contracted to act diligently, but that fact does not mean they are controlled in any sense of the word. Nor do we think because of this contract that the prosecutor constituted the Heights its agents for the furtherance of its business within the meaning of section 19 (g). The Heights were agents only for the purpose of selling on commission the products of prosecutors and for no other purpose.

Nor do we think the decision in *Singer Sewing Machine Co.* v. *New Jersey Unemployment Compensation Commission, supra,* relied on by the Board, is in point. The facts in that case are quite different from those of the case at bar. There, the distributor dealt exclusively in the products of the Singer Company, and he was restricted in the territory in which he carried on his business. The contracts were made directly between the Singer Company and the customer or vendee in each case, and the distributor was under obligation to "repossess and recover for, and deliver to the company any such property sold or leased when repossession is authorized and desired by the company." The court in that case said, "The employment here contracted for was indubitably a part of prosecutor's usual trade or business in the legislative sense," and the employees of the distributor were engaged in "an employment constituting a component part of the usual trade, occupation, profession or business of such employing unit." To put it differently, the court meant that the distributor was not carrying on his own business but rather the business of the Singer Company. The facts in the instant case clearly are that the Heights are engaged in a rather varied and extensive line of business and are surely not engaged solely in the sale of prosecutor's goods. The business of the Heights

was not controlled or supervised by prosecutor and was not, as in the Singer Company case, a part of prosecutor's usual trade or business. If the argument is sound that because of this consignment agreement Handelong was engaged in employment constituting a component part of the usual trade, &c., of the prosecutor and was indeed in effect its agent or employee, then it would follow that he occupied the same status with all the other firms whose goods were also sold by the Heights under consignment agreements. That would also be true of department store employees engaged in selling merchandise of its storekeeper employer together with perhaps a large variety of goods of others sent to the store for sale on a commission basis under consignment agreements. We do not think the statute in question or the ruling in the Singer Company case may be so construed.

Identical and similar consignment agreements under federal and other state Unemployment Compensation Acts similar to ours have been construed by the courts, and in no case has it been held that the distributors and their employees were employees of the consignors, within the meaning of such statutes. Compare *The Texas Co.* v. *Higgins,* 118 *Fed. Rep.* (*2d*) 636; *Indian Refining Co.* v. *Dallman,* 119 *Id.* 417; *The Texas Co.* v. *Wheeless* (*Miss.*), 187 *So. Rep.* 880; *Barnes* v. *Indian Refining Co.,* 280 *Ky.* 811; *affirmed,* 134 *S. W. Rep.* (*2d*) 620; *The Texas Co.* v. *Bryant,* 152 *Id.* 627; rehearing denied, 163 *Id.* 71; *American Oil Co.* v. *Fly,* 135 *Fed. Rep.* (*2d*) 491; *Standard Oil Co.* v. *Glenn,* 52 *Fed. Supp.* 755; *Orange State Oil Co.* v. *Fahs,* 52 *Id.* 509; *affirmed,* 138 *Fed. Rep.* (*2d*) 743.

The decision under review will be reversed.