[No. 29492. *En Banc.* June 28, 1945.]

SEATTLE AERIE NO. 1 OF THE FRATERNAL ORDER OF EAGLES, *Appellant,* v. THE COMMISSIONER OF UNEMPLOYMENT COMPENSATION AND PLACEMENT, *Respondent.*[1]

[1]Reported in 160 P. (2d) 614.

Cornelius C. Chavelle (Chavelle & Chavelle, of counsel), for appellant.

The Attorney General, George W. Wilkins, and Bernard A. Johnson, Assistants, for respondent.

SIMPSON, J.—This appeal involves two applications made by Seattle Aerie No. 1 of the Fraternal Order of Eagles for refund of unemployment compensation taxes paid by it

from March 16, 1937, to June 30, 1942. Claims for refund were properly made by the lodge and denied by the commissioner of unemployment compensation and placement. Thereafter a hearing was had before the appeal tribunal. The appeal tribunal decided that the denial of refund as pronounced by the commissioner was just and correct and therefore affirmed his decision, whereupon the lodge appealed to the superior court of King county. The record of the department reviewed by the court resulted in the entry of a judgment affirming the order of the appeal tribunal. Seattle Aerie then appealed to this court.

Its assignments of error are: Sustaining the findings of the commissioner and the appeal examiner and in decreeing that the findings were not arbitrary or capricious; sustaining the commissioner's and appeal examiner's determination that the individuals involved were in employment within the meaning of the unemployment compensation act; sustaining the correctness of the commissioner's and appeal examiner's application of the law to the facts; and entering the judgment of dismissal.

The undisputed facts are these: Appellant is a fraternal organization incorporated under the laws of the state of Washington and affiliated with the Grand Aerie of the Fraternal Order of Eagles, of which appellant is the parent member. At the time of the hearing, the membership of appellant was about fifteen thousand four hundred, while the national order, which includes twelve hundred twenty aeries, has approximately seven hundred fifty thousand members. Appellant is a nonpartisan and nonsectarian organization, and its fundamental purposes are social, fraternal, beneficial, humanitarian, and patriotic. It owns a large building at 1416 Seventh avenue in Seattle, in which are centered its social and lodge activities.

During the period in question, March 16, 1937, through June 30, 1942, appellant conducted public dances in its building. During that period of time three orchestras supplied music for the dances. The orchestras performing at different times were under the leadership of Bill Winters, Arden Stevens, and Kenneth Cloud, and were known as

"Bill Winter's Senators," "Arden Stevens' Commodores," and "The Commodores." In each instance, before a contract was made, application for the business was made by the orchestra leader to the manager of the dances. The dances were managed by J. M. Hooper, who was a member of the board of trustees of appellant lodge. At the conclusion of the dances, which occurred on Saturday nights, Mr. Hooper gave to the leader a check covering the wages of the members of the orchestra who had played that evening. The check was made payable to the orchestra leader. The musicians were members of the musicians' union and were employed by the leaders of the orchestras.

Mr. Hooper testified:

"Q. During the entire period involved here, did you have any occasion or did you have the right or did you discharge any individual members of any of these orchestras? A. I had no occasion or had no right to ·discharge or hire any member of the orchestra. Q. Under whose control were the individual members? A. The leader's control. Q. Did you furnish any instruments for Arden Stevens' orchestra? A. We did not. Q. Did you tell him the type of music to be played? A. Nope. Q. Did you set the ·intermissions? A. No. Q. Did you furnish the sheet music? A. I did not. . . . Q. This may be repetitious, but I will ask you it again. During the period of time that Arden Stevens played for the Seattle Aerie No. 1, Fraternal Order of Eagles, or Kenneth Cloud and Bill Winter, did you or anybody on behalf of Seattle Aerie No. 1 ever fire any individual members of those orchestras? A. We had no right to. Q. Did you ever hear of any individual members being fired or by whom he was fired during the period of time that you were managing the dance there? A. No, I couldn't, they made some changes though. Q. . Who made the changes? A. The leader. . . . Q. And you don't know what amounts were paid to each member? A. I don't know what he paid them. I know what the scale was per man, what he should pay them is or was. Q. All of the members of the orchestra were members of the union? A. They were all members of the union. Q. Did you always have a minimum number of musicians? A. Always had the minimum. Sometimes the leader got an extra man from time to time. Q. And that usually ran eight, nine or ten? A. Yes, whatever he happened to want at the particular time, although

we had to limit him, had to keep him from hiring any more.
Q. Is that because you were bound by the amount that
you were to pay the orchestra leader or is that for purposes
of your own? A. Sometimes he wanted better instrumen-
tation and he wanted to put on more men. We allowed him
to do that from time to time. . . ."

The oral contracts made with the leaders of the orchestras
could be terminated upon two weeks' notice by either the
managing trustees or the orchestra leaders. The proceeds
from the dances found their way into the various funds into
which appellant allocated its revenues. So far as the record
discloses, the orchestras did not play for other lodges or
organizations.

The single question presented by appellant's assignments
of error is: Were the members of the orchestras employees
of appellant lodge within the meaning of our unemployment
compensation statute?

It is the contention of appellant that the orchestra leaders
were independent contractors, and that the members of the
orchestras were employees of the leaders and not of the
appellant lodge. In none of our compensation cases so far
decided have we had a situation in which one man (orches-
tra leader in this case) contracted to do a certain thing and
then hired others to assist him in fulfilling his agreement.
The unemployment compensation statute does not define
independent contractor.

In the following cases, this court has defined who
are independent contractors and that the principal is not
liable to men engaged by independent contractors: *Boyle
v. Great Northern R. Co.,* 13 Wash. 383, 43 Pac. 344; *Ziebell
v. Eclipse Lbr. Co.,* 33 Wash. 591, 74 Pac. 680; *Miller v.
Moran Bros. Co.,* 39 Wash. 631, 81 Pac. 1089; *Engler v.
Seattle,* 40 Wash. 72, 82 Pac. 136; *Larson v. American Bridge
Co.,* 40 Wash. 224, 82 Pac. 294; *Kendall v. Johnson,* 51 Wash.
477, 99 Pac. 310; *Seattle Lighting Co. v. Hawley,* 54 Wash.
137, 103 Pac. 6; *Campbell v. Jones,* 60 Wash. 265, 110 Pac.
1083, 20 A. L. R. 671; *Cary v. Sparkman & McLean Co.,* 62
Wash. 363, 113 Pac. 1093; *Bowen v. Smyth,* 68 Wash. 513,
123 Pac. 1016; *Watson v. Hecla Mining Co.,* 79 Wash. 383,

140 Pac. 317; *Johnston v. Seattle Taxicab & Transfer Co.*, 85 Wash. 551, 148 Pac. 900; *Machenheimer v. Department of Labor & Industries*, 124 Wash. 259, 214 Pac. 17; *Reynolds v. Addison Miller Co.*, 143 Wash. 271, 255 Pac. 110; *Nettleship v. Shipman*, 161 Wash. 292, 296 Pac. 1056; *Amann v. Tacoma*, 170 Wash. 296, 16 P. (2d) 601; *Hollingsworth v. Robe Lbr. Co.*, 182 Wash. 74, 45 P. (2d) 614; *Mitchell v. Maytag-Pacific-Intermountain Co.*, 184 Wash. 342, 51 P. (2d) 393; *Sills v. Sorenson*, 192 Wash. 318, 73 P. (2d) 798; *Hubbard v. Department of Labor & Industries*, 198 Wash. 354, 88 P. (2d) 423; *Washington Recorder Pub. Co. v. Ernst*, 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667; *White v. J. R. Watkins Products Co.*, 1 Wn. (2d) 466, 96 P. (2d) 456; *Apenese v. Department of Labor & Industries*, 3 Wn. (2d) 45, 99 P. (2d) 629; *McFarland v. Commercial Boiler Works*, 10 Wn. (2d) 81, 116 P. (2d) 288; *Miles v. Pound Motor Co.*, 10 Wn. (2d) 492, 117 P. (2d) 179.

These cases define an independent contractor to be one who, exercising an independent employment or occupation, contracts to do a piece of work according to his own idea or in accordance with plans previously furnished to him by his employer and has the right to select his own assistants, the employer having no control over the hands doing the work further than to require that it should be done in compliance with the plans and specifications under which it is contracted to be done, the contractor representing his employer only as to the results of his work and not as to the means whereby it is to be accomplished. A reservation by the employer of the right by himself to supervise the work for the purpose of merely determining whether it is being done in conformity to the contract does not affect the independence of the relationship.

The cases also lay down the rule that there is no privity between the original employer and the employees of the independent contractor, and that the employer is not liable to the workers for their pay nor for the negligence of the independent contractor.

Obviously, the band leaders were independent contractors. The number of musicians employed were, sub-

ject to certain union regulations, controlled by them. Their contract was to produce a specific result. They were to furnish all the music and instruments, except the piano, and do all the work; and by the use of that material and the means of that work they were to furnish the completed production of music for the dances. The will of the appellant was represented only in the result of the work and not in the means by which it was accomplished.

The approach to the solution of the question must be and is governed by our recent holding in the case of *Broderick, Inc. v. Riley*, 22 Wn. (2d) 760, 157 P. (2d) 954, in which it was stated, after calling attention to the many cases having to do with unemployment compensation taxes and awards:

"It may be that we have not been as definite as we might have been in setting out the steps to be followed in determining whether or not one was in 'employment' under the act. In order to clear up any possible misunderstanding that may now exist, we now state, after a consideration of the statute, our own cases and other authority, that in making the initial determination of whether or not one is in employment under the act, the first question to be determined is whether, under the facts, such one performed personal services for another for wages, or remuneration, or under a contract of hire. Such a contract of hire contemplates a relationship whereby the employee furnishes personal services to his employer for wages or remuneration to be paid by such employer. If this question be answered in the affirmative, then under the act such one is in employment. If this question be answered in the negative, such one is not in employment under the act. If the question be answered in the negative, then Rem. Supp. 1943, § 9998-119g (5), has no application and is not to be considered. If the question is answered in the affirmative, then such person is in employment under the act, unless excluded from its operation by reason of having met the tests prescribed by § 9998-119g (5).

"We stated in *In re Hillman Inv. Co.*, 15 Wn. (2d) 452, 131 P. (2d) 160:

" 'Since the claimants performed services for remuneration, they were employees of appellant within the meaning of the act, *unless it appears that they were exempt under*

*the exceptions contained in Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (g) (5), which provides: . . . .'* (Italics ours.)

"This case was decided November 24, 1942. It distinguishes the *Recorder* case, *supra,* and refers to *Sound Cities Gas & Oil Co. v. Ryan, supra,* and *Mulhausen v. Bates, supra.*

"As applied to the instant case, the first question to be considered would be whether or not, under the facts, these brokers performed personal services for appellant for wages, or remuneration, or under a contract of hire. If the question be answered in the affirmative, then under Rem. Supp. 1943, § 9998-119g (1), such brokers would be in 'employment' under the act unless excluded by reason of having met the tests prescribed by Rem. Supp. 1943, § 9998-119g (5). If the question be answered in the negative, then these brokers would not be in employment under the act, and Rem. Supp. 1943, § 9998-119g (5) would have no application and would not be considered, for subsection (5) is an exception provision, applying and applicable only after it has been determined that one is in employment under the act."

We must also have in mind that the factual situation in any given case must largely determine the conclusion to be reached; though, of course, we must be guided by and adhere to general principles, especially those which have stood the test of time.

The holding made in the case just cited was adhered to in *Curtis v. Riley,* 22 Wn. (2d) 951, 157 P. (2d) 975, and *Coppage v. Riley,* 22 Wn. (2d) 802, 157 P. (2d) 977.

In applying the above rule of the *Broderick* case, we must ascertain whether or no the musicians performed personal services for wages or remuneration. If it be found that they performed such personal services for wages or remuneration for appellant, then we must go a step farther and ascertain whether the appellant is exempt under the provisions of Rem. Rev. Stat. (Sup.), § 9998-119 [P. P. C. § 928-15]. If, on the other hand, it be decided that the individuals did not perform personal services for wages or remuneration for appellant, then we cannot further consider the case, but must hold appellant free of the taxes.

The case most nearly in point in this state is *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718.

The controversy in that case arose over services performed by boys who delivered the "Daily Olympian" in compliance with a written contract. Under the contract the carriers purchased the papers from the publishing company at an agreed price and sold them to their customers at a price stipulated in the contract. The proceeds of the sale by the carriers belonged to them, and no report was required by the original seller. Losses occasioned by carriers' sales fell upon them. Upon the facts then present this court held that the carriers were independent contractors and did not come within the taxing act.

In passing upon the question, we made the following unassailable statement:

"If one is engaged in his own independently established business, he is not subject to control. If an individual is subject to control or direction, he is pursuing another's business and not an independent business of his own."

We shall now consider several cases from other states which clearly indicate the rule to be followed. In doing so, we cite cases from those states which have unemployment compensation statutes alike or similar to our own.

The facts in the case of *Unemployment Compensation Comm. v. Mathews*, 56 Wyo. 479, 111 P. (2d) 111, are exactly like those in the case at bar. We set out the pertinent facts as indicated by the supreme court of Wyoming. J. P. Mathews was doing business under the firm name and style of "The Palace Cafe and Bar Service" and also operated in connection a room called the "Palace Gardens."

"The evidence submitted in the case deals chiefly with the relations existing between the owner and two bands or orchestras directed, one by a man by the name of Brooklander and one by a man named Sidell. The boss or director of each orchestra or band directed its work. They were paid weekly by checks payable either to the order of the directors or leaders of the orchestras or to 'Brooklander's Orchestra' or to 'Sidell's Orchestra.' These checks were always endorsed by the several directors or leaders of these organizations, but not by the individual members thereof when they were cashed. Some of the checks were cashed in the bank and others in grocery stores where they had been

trading. Wallace hired Brooklander and either Mathews or Wallace hired Sidell to furnish music for the patrons that came to the Palace Gardens room for 'refreshments, eats.' Neither the owner nor Wallace had the right to discharge members of these bands or orchestras, that right being vested in the director of these several organizations. Occasionally Wallace told Brooklander when to take intermissions in playing, though originally Brooklander and Wallace had a general agreement, entered into before his organization commenced its work, to take intermissions just before the bar closed. Sidell testified that he was told that in taking other intermissions he was to use his own judgment. The checks aforesaid were cashed by the leaders of these organizations, and the other members were paid by such leaders after deducting any board bills or 'tabs' owed by them to the cafe of the owner.

"The musicians in these several organizations supplied their own musical instruments, though the owner furnished a piano which was used by them in the course of their work. The Musicians' Union of the City of Sheridan governed the minimum rate to be paid these bands or orchestras for their services. In the case of the two organizations just mentioned payment was required to be made in the sum of $27.50 for the leader and $25.00 each per week for 'side men', and the leaders contacted 'men to play' engagements for the owner. In other words, the owner or Wallace merely hired the leader and he hired his musicians, the minimum wage scale for the band being fixed by the Musicians' Union of the City of Sheridan. The leaders of these bands or orchestras were privileged to obtain more money for their weekly services if they could obtain it. Under the aforesaid Union's rules there must be 'a leader or contractor.' These organizations could have had other engagements so far as they did not conflict with their engagement at the Palace Gardens.

"The owner did not furnish the music these several organizations used in rendering their services. On a couple of occasions Mathews or Wallace told Brooklander what pieces were to be played. Brooklander told his organization when to start and when to stop playing and also when to play encores. These leaders had the final authority to determine what music should be played and were the sole judges as to whether any musician in his organization was doing his work properly. The members of these orchestras or bands 'looked to' their leaders for payment of their salaries, if such leaders

received money from the owner for the orchestra's weekly wages and did not pay it over to them. These orchestras or bands played in other cities in the state, the Brooklander organization playing in Casper, Wyoming, under the name 'Jimmie Brooklander and his Band' sometime before they came to Sheridan. The Sidell organization was designated 'J. Sidell and Boys,' and Sidell testified that he was 'responsible to the members of that band for their salary.'

"Brooklander never paid any Social Security tax for the musicians employed by him, though he offered to pay them to the government. Before Brooklander was employed by Wallace the other employers Brooklander worked for deducted the tax from the latter's pay check, but Wallace did not do so, as he said he did not have anything to do with it. Wallace testified for the defendant that 'at times if I didn't think they (the musicians) were playing often enough I would go around and ask them to play more often,' and they usually did so."

The unemployment compensation act of Wyoming is worded the same as ours. The court held that the members of the orchestra were working for an independent contractor—that is, the director—and that the owners of the places of entertainment were not responsible for payment of the unemployment compensation tax.

In the case of *California Employment Comm. v. Rose*, 155 P. (2d) (Cal. App.) 702, it was held that a man who was engaged in the business of baling hay on contract for farmers who produced crops was an independent contractor, and that he and his employees could not be listed as agricultural laborers.

In 1940, the supreme court of Utah decided the case of *Fuller Brush Co. v. Industrial Comm.*, 99 Utah 97, 104 P. (2d) 201, 129 A. L. R. 511, in which it was held that, where a corporation engaged in the manufacture and sale of brushes furnished dealers with sample cases, but sold the goods to the dealers for cash, for purpose of resale at suggested retail prices which were not binding on the dealer, and where dealers were free of all direction or control with respect to hours, methods, or reports, that the dealers did not render personal services for the corporation under contract for hire or wages so as to be within the coverage of the

unemployment compensation act. This opinion has been cited with approval in *Meyer & Co. v. Unemployment Compensation Comm.*, 348 Mo. 147, 152 S. W. (2d) 184, and *Guaranty Mortgage Co. v. Bryant,* 179 Tenn. 579, 168 S. W. (2d) 182.

The first unemployment compensation act was passed by the state of Wisconsin and is worded the same as the unemployment compensation act of this state. The supreme court of Wisconsin had occasion to pass upon the following facts in *Wisconsin Bridge & Iron Co. v. Ramsay,* 233 Wis. 467, 290 N. W. 199:

"The claimants were employed in erecting materials and parts fabricated by the company into certain structures that the company had contracted to construct and install for the paper company. Their work was done under the immediate supervision of one Drews for the greater part of the construction work, and later under the immediate supervision of one Michaelis, both of whom had previously been in the employ of the company as superintendents of construction work done directly by the company. It is claimed by the respondents that the company was itself doing the construction work upon which the claimants were engaged, and that both Drews and Michaelis were in the employment of the company in the instant jobs acting as superintendents or foremen of and for the company. It is contended by the company that Drews was an independent contractor to whom the company had let the construction work involved, and that Michaelis, after Drews left the job, was acting not for the company but for Drews as the latter's superintendent or foreman. There is no question that the claimants are within ch. 108, Stats. 1937, either as employees of the company or of Drews.

"It is undisputed that the company in form let the work of construction to Drews, and that the form of the contract with him in all respects conformed to the contract regularly and customarily used by the company in subletting construction work. It is also without dispute that Drews hired the claimants and all other workmen on the construction jobs; that the claimants were paid by checks drawn by Drews; that Drews listed himself with the Industrial Commission as an employer under the act and set up and paid to the commission the reserves required from employers by the act; that Drews as such employer procured com-

pensation insurance for the protection of his employees and paid the premiums therefor; and that the claimants had no contact whatsoever with the company and no contract of service or hire except their contract with Drews. Drews was paid nothing by the company for his connection with the job except the contract price fixed by his contracts with the company and the company exercised no control whatever over the workmen on the construction jobs, and no control over Drews except such as was indirectly involved in seeing that he properly fulfilled his contract for construction and completed the work according to the specifications of the contracts, to which kind of control an independent contractor is always subject. None of the work covered by Drews' contracts was performed on premises of the company.

"Drews had prior to entering into the contract for construction been regularly in the employment of the company. After letting to him the instant contract, the company let to him four other contracts for construction of works elsewhere. When the work on the instant job had progressed so that Drews' presence on the job was not required, a superintendent who had been an employee of the company was put in charge. This superintendent was not paid by the company, and must therefore have been paid by Drews. Drews then entered the employment of the company engaged in work having no connection with the instant contract or his other construction contracts above mentioned. Drews had not been in business as a contractor prior to entering into the instant construction contract, and had theretofore generally been in the employ of the company, but had been at times employed by others also.

"Before the contract with Drews for the instant construction was made the company was about to proceed with the work of construction itself and applied to the business agent of the Iron Workers' Union of Milwaukee to furnish men for the construction job. The agent refused to furnish men to the company because the company had refused to enter into a closed-shop agreement, but told the company's representative that he would furnish men to Drews if Drews took the job under an 'under-cover' arrangement. The agent made the suggestion for such an arrangement. Following this suggestion the subcontracts were let to Drews and the agent of the union sent the claimants and other workmen to Drews who hired them, and paid them with his own checks."

The court held that the claimants were employees of an independent contractor, and that the original contractor was not responsible for unemployment compensation taxes. The court also stated:

"We call attention to another erroneous idea of the appeal tribunal that may have in some degree influenced their decision. It was stated early in the hearing before the tribunal, by Mr. Alexander, the chairman of the tribunal, that:

" 'The Unemployment Compensation Act does not exclude *independent contractors*. Roughly speaking, first, the employer [company] must show that the employee [independent contractor Drews] was free from his [company's] control and direction, *both under his* [Drews'] *contract and in fact;* two, either that the employee [independent contractor Drews] was engaged outside of the usual course of the employer's [company's] enterprise or outside of all the employer's [company's] places of business; and three, that the individual [independent contractor Drews] was customarily engaged in an independently established trade, business, profession or occupation.'

*"That this was an erroneous conception is apparent on the face of it. Manifestly if Drews was an independent contractor he was free from the company's control. He could not be subject to the company's control and still be an independent contractor.*

"In view of the error of the appeal tribunal in basing their determination of Drews' status as an employee on subs. (3) and (5) (a) of sec. 108.02, Stats. 1937; the meaning apparently attributed by them to the word 'subterfuge' in their decision; and their misconception that Drews might have been a subcontractor of the company and still have been its employee, we conclude that the judgment of the circuit court should be reversed with directions to the circuit court to vacate the award of the Industrial Commission and direct the commission to remand the cases to the appeal tribunal for retrial. Upon the retrial the evidence of Drews, Michaelis, and Christnelli, or whoever negotiated the work orders with Drews, should be produced, either by deposition or as witnesses before the tribunal. All the employees of the company have an interest in its unemployment benefit fund. As unemployment compensation is payable out of and limited by the amount of the fund contributed by the particular employer of whom the applicant for compensation is an employee, it is

as important for the appeal tribunal to see that the fund contributed by an employer is kept intact for the benefit of the employer's employees as that an applicant may receive the compensation to which he is entitled. The fund should not be depleted by payment to employees of independent subcontractors of the employer to the end that the employer's own employees may not through such depletion be deprived of the full compensation which the employer's fund will yield them. There is no question that the instant applicants are entitled to compensation either out of the fund contributed by Drews, or from the fund contributed by the company enhanced by the contributions paid by Drews and credited to him by the commission. Their claim against the company's fund is manifestly made because that fund will pay them in full, while the fund contributed by and credited to Drews will not." (Italics ours.)

Michigan has an unemployment compensation act similar to the one we have in this state. The supreme court of that state had occasion to pass upon the act in *Baker, Inc. v. Ryce,* 301 Mich. 84, 3 N. W. (2d) 20. The holding of the court is indicated in the syllabus in the North Western report, which reads:

"Where an individual had an arrangement with a company engaged in used automobile business, to do all of repair work on automobiles as requested by company, whereby repair work was to be done in company's building at base price of approximately two-thirds of what work would normally cost elsewhere, remaining one-third being added to make up total price paid by company's customers and set up on books of company as rental income from the building, a workman employed by the individual was not an 'employee' of the company, within Unemployment Compensation Act, notwithstanding reservation by company of right of inspection of the repair work."

The supreme court of Missouri in *Meyer & Co. v. Unemployment Compensation Comm.,* 348 Mo. 147, 152 S. W. (2d) 184, had before it the question of whether or not the company was compelled to pay unemployment compensation taxes. The Missouri statute reads the same as ours. In passing upon the exceptions in the statute which are similar to ours, the court said:

"We think it is clear that the tests set out in our subsection (5) (a), (b), (c) are usual tests for determining whether or not the relation of independent contractor exists, and that the purpose of placing said subsection in the act was to make plain the basis upon which those in the independent contractor relationship were to be excluded."

. The facts in that case are somewhat similar to those in the *Broderick* case.

In *Texas Co. v. Bryant,* 178 Tenn. 1, 152 S. W. (2d) 627, the supreme court of Tennessee held that consignees of an oil company which distributed the products of the company on a wholesale basis and under a written contract were independent contractors and not employees of the company, and hence neither they nor their employees were liable for contributions under the unemployment compensation law; in view of the provisions of the contract which included a provision making consignees' earnings dependent on the amount of their sales and another provision requiring consignees to bear all expenses of operation, including wages paid to their employees. Their unemployment compensation law reads the same as that of this state.

In *Northwestern Mutual Life Ins. Co. v. Tone,* 125 Conn. 183, 4 A. (2d) 640, 121 A. L. R. 993, it appears that a life insurance company employed general agents under authority to enter into contracts with district agents or special agents for the development of various portions of the territory. The company had no liability for rent or incidental expenses connected with the conduct of agents' business. Each general agent maintained an office and conducted his activities entirely at his own expense, although the name of the company usually appeared on the door of the office. The income of the general agents came from two sources: commissions, which were fixed percentages of premiums collected for a limited number of years on applications secured by the general agent or agents operating under him, and collection fees, a fixed percentage of premiums collected in certain cases where he is not entitled to a commission. The income of other agents consisted entirely of commissions based upon the policy con-

tracts secured by them. The company recognized no obligations as to the distribution of commissions among the various agents. Neither did the company exercise supervision or control over any of its agents with respect to the place and manner in which the business was conducted, but the company did have an interest in the development of the territory and had the right, if any agent neglected his territory to the injury of the company's business, to terminate the contract. The court held that the agents were not employees or servants within contemplation of the unemployment compensation act.

Under the New York state unemployment insurance act is the case *In re Brown*, 260 App. Div. 972, 23 N. Y. S. (2d) 330. The facts in that case show that the claimant was a vocalist and a member of the Dick Stabile Orchestra, which was engaged by the Statler hotel to play during certain hours. In passing, the court said:

"The issue presented here is whether Dick Stabile was an independent contractor and employer of claimant, or whether Dick Stabile and each and every individual member of his orchestra were employees of appellant. The unemployment insurance referee and the appeal board held that claimant was an employee of the appellant. Clearly, she was not such an employee but was an employee of Dick Stabile, an independent contractor, for a certain period of time. Appellant did not hire the individual members of the orchestra, nor did it enter into a contract with Stabile, as agent. Through a booking agency appellant contracted for the services of an orchestra, the members of which were the employees of Dick Stabile. This case is readily distinguishable from the case of *Matter of Rogavin*, 259 App. Div. 774, 18 N. Y. S. 2d 302, and *Matter of Ajello*, 259 App. Div. 949, 19 N. Y. S. 2d 886."

The facts in *In re Miller*, 262 App. Div. 385, 29 N. Y. S. (2d) 15, are almost identical with those in the instant case. The facts and the court's holding are contained in the following excerpt:

"On February 3, 1938, appellant, the owner of a restaurant and night club known as Chez Ami in the city of Buffalo, N. Y., and Royal Worth entered into a written contract reading as follows:

" 'It is agreed that Royal Worth will furnish an orchestra consisting of Twelve (12) men, to play in the Chez Ami Club between the hours of 7:00 P. M. to 9:00 P. M. and 10:00 P. M. to 3:00 A. M. daily.

" 'It is agreed that this contract is to be in effect for a period of four (4) weeks, with the proviso that Phil Amigone, owner of the Chez Ami Club has the option to extend said contract for a period of four (4) weeks upon the mutual agreement of both parties hereto.

" 'For said services Phil Amigone, owner of Chez Ami Club, agrees to pay Royal Worth, the sum of Seven Hundred and Fifty (750.00) dollars weekly.'

"The sole question to be determined is whether or not appellant was claimant's employer within the meaning of article 18 of the Labor Law.

"From February 3 to July 12, 1938, Worth's Orchestra, of which claimant was a member, furnished music at appellant's establishment. Claimant was a member of the orchestra prior to the date when Worth made his contract with appellant. He continued as a member thereof for some time after the termination of that contract.

"Worth's orchestra was not assembled or organized for the purpose of playing at the Chez Ami. It was a completed unit before that contract was made. Worth evidently intended that it should be a permanent organization which he expected would rapidly gain recognition by those catering to night club frequenters. The orchestra included a number of expert musicians whose services were obtained by Worth on the promise that he would pay them more than the union scale of wages. In fact the evidence discloses that Worth paid his musicians an amount in excess of that which he received from appellant. None of the members of the band was employed by appellant, or carried on his payroll. He had no supervision over them and no authority to direct or control their actions. Appellant could not employ or discharge claimant. In fact it was conceded that he had no authority to either make or even suggest changes in the personnel of the organization. At the end of each week appellant paid Worth the sum stipulated in the contract. The latter paid the members of his band.

"From the proof in this record there cannot be the slightest doubt that Worth was an independent contractor and that claimant and the other members of the orchestra were his employees. (*Hexamer v. Webb*, 101 N. Y. 377; *Uppington v. City of New York*, 165 id. 222; *Matter of Beach v.*

*Velzy,* 238 id. 100; *Brown v. Hotels Statler Company, Inc.,* 260 App. Div. 972.)

"Although it is apparent from an examination of cases involving the independent contractor relationship that there is no absolute rule for determining whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless, there are many well-recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one or more of such indicia in a case is not necessarily conclusive. It has been held that the test of what constitutes independent service lies in the control exercised, the decisive question being as to who has the right to direct what shall be done, and when and how it shall be done. Practically every contract for work to be done reserves to the employer a certain degree of control, to the end that he may see that the contract is performed according to specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for a relation of master and servant is not inferable from a reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with the contract. The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work as well as of the result; an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result but not as to the means or manner of accomplishment. Accordingly where an employer may prescribe what shall be done, but not how it shall be done or who shall do it, the person employed is an independent contractor."

The court of appeals of Georgia in *Huiet v. Great Atlantic & Pacific Tea Co.,* 66 Ga. App. 602, 18 S. E. (2d) 693, decided the same as this court did in the *Broderick* case. Georgia's unemployment compensation act has the same provisions as the compensation act of this state. In that case it appeared that a man leased space from the Great Atlantic and Pacific Tea Company, whose manager decided when the store should be opened and closed. The lessor was subject to the Tea Company's rules in that he had to have the right kind of fellow workers and the right kind

of meat in his store. The company adopted rules governing the whole store, and the people who leased the market were compelled to comply with those rules. Upon these facts, the court held that the lessor and his employees were not the employees of the Tea Company. In passing, the court said:

"If the relationship of employer and employee is proved, then of course the employee would be entitled to compensation unless all three of the exceptions were also proved."

The case of *Texas Co. v. Wheeless*, 185 Miss. 799, 187 So. 880, holds that where contracts between an oil company and consignees for distribution of petroleum products did not create master-servant relation, and many consignees were firms or corporations and most of them were engaged in other businesses, the arrangment was not a contract of hire within the statutory definition of "employment" and the oil company was not required to contribute to the unemployment compensation fund. There, the supreme court of Mississippi held that the correct test, as to who is a servant, is whether the service is rendered by one whose physical conduct, time, and activities in the performance of his duties are controlled, or are subject to the right of control, by the alleged master under the contract of employment or hire. The record of the *Wheeless* case is therein distinguished from that of *Texas Co. v. Mills*, 171 Miss. 231, 156 So. 866, 869.

In the *Mills* case the decision was predicated upon the fact that the duties of the distributor in that contract were expressly fixed by " 'the rules and practices of the company, and by instructions issued . . . from time to time' "; the distributor being required by the contract itself to " 'strictly observe and obey the company's instructions' " in the performance of his duties. The court in the *Mills* case applied the test whether the alleged servant's physical conduct in the performance of the services in the affairs of his employer is controlled, or is subject to the right of control, by the alleged master, and held that the foregoing quoted provisions of the contract subjected him to the

appellant's control with respect to his physical conduct in the performance of his duties, citing *Singer Mfg. Co. v. Rahn*, 132 U. S. 518, 33 L. Ed. 440, 10 S. Ct. 175.

In *Texas Co. v. Wheeless, supra,* the court also referred to the case of *Texas Co. v. Jackson*, 174 Miss. 737, 165 So. 546, and said that there the Mississippi court had again construed the provisions of a contract similar to those construed in the *Mills* case, giving the same effect as given in the *Mills* case. Those provisions were not in the contract involved in the *Wheeless* case.

The following cases are in accord with those from which we have quoted: *Barnes v. Indian Refining Co.*, 280 Ky. 811, 134 S. W. (2d) 620; *Guaranty Mortgage Co. v. Bryant*, 179 Tenn. 579, 168 S. W. (2d) 182; *Florida Industrial Comm. v. Peninsular Life Ins. Co.*, 152 Fla. 55, 10 So. (2d) 793; *Gentile Bros. Co. v. Florida Industrial Comm.*, 151 Fla. 857, 10 So. (2d) 568; *Texas Co. v. Higgins*, 118 F. (2d) 636; *Stover Bedding Co. v. Industrial Comm.*, 99 Utah 423, 107 P. (2d) 1027; *In re Wilson Sullivan Co.*, 289 N. Y. 110, 44 N. E. (2d) 387; *Wolfe v. Bryant*, 181 S. W. (2d) (Tenn.) 343; *Mace v. Morrison & Fleming*, 267 App. Div. 29, 44 N. Y. S. (2d) 672.

We call attention to several cases decided by our Federal courts in which the national employment compensation statute has been construed. As an introduction to those cases, we quote the pertinent portions of the national act, 42 U. S. C. A. 617, § 1011:

"(a) The term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash; . . .

"(b) The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, . . ."

The above definitions of wages and employment, while not as explicit, is as inclusive of all forms of service employment as Rem. Supp. 1943, § 9998-119g (5) [P. P. C. § 928-15], which reads:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this act un-

less and until it is shown to the satisfaction of the Commissioner that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service."

A distributor who was sole owner of a bulk plant, realty, tanks, and personalty where oil refiner's products were sold and who had sole control over hiring and firing of employees necessary for distribution and paid all expenses of operation of plant, together with advertising and social security taxes, was an independent contractor, and neither distributor nor his employees were employees of the refiner, as respects liability of refiner, notwithstanding refiner had the right to suggest means of increasing sales and notwithstanding the mutual right to terminate the agreement between the refiner and the distributor. *Texas Co. v. Higgins*, 32 F. Supp. 428.

Where consignment agreements between oil refiner and distributor provided that distributor should diligently market and distribute refiner's products at authorized prices, paying all expenses of operation of bulk station plant, in return for specified commissions, but refiner reserved no control over methods of operation either by agreement or in actual practice, distributor was an independent contractor, and neither he nor his employees were refiner's employees so as to make refiner liable for Federal unemployment taxes. *Indian Refining Co. v. Dallman*, 31 F. Supp. 455. Affirmed by circuit court of appeals, seventh circuit, *Indian Refining Co. v. Dallman*, 119 F. (2d) 417.

In *Williams v. United States*, 126 F. (2d) 129, it appears that an individual was a leader of a dance orchestra known as "Griff Williams and His Orchestra," who in 1934 entered

into an agreement with the Music Corporation of America, making this corporation his exclusive agent for the purpose of booking engagements for the orchestra, for which service the agent was paid a commission:

"By the terms of the contract, the Music Corporation agreed to furnish the establishment with the attraction designated as 'Griff Williams and His Orchestra,' at a certain time and place for an agreed price. The hours of performance were stated. In some of the contracts the number of sidemen was stated—in others it was not. Each of the contracts incorporated by reference the laws, rules and regulations of the American Federation of Musicians. By such rules and regulations, certain restrictions were placed upon the contracting parties with respect to prices for performance, the number and length of rehearsals and intermissions, cancellation of contracts and conduct of the leader and sidemen. The establishment is referred to in the contracts as the 'employer' and in the same manner, in the by-laws of the Federation, although in the latter, plaintiff is also referred to as 'employing the sidemen.' The sidemen owned both formal and informal dress and furnished their own instruments other than the piano which was furnished by the establishment. Plaintiff owned music racks and a public address system for use where this equipment was not supplied by the establishments. The latter owned and controlled the premises on which the services were performed and designated the particular room on the premises where the orchestra was to rehearse and perform. Occasionally the orchestra played special music for floor shows promoted by the establishments. On such occasions the selections to be played were made by the establishments, or by the participants in the floor shows. This called for special rehearsals with the other talent, at times and places fixed by the establishment within the limit of the Federation rules. The time of regular rehearsals, however, was fixed by plaintiff. As stated, this is a brief synopsis of the noncontroverted findings."

Based upon the above-stated facts, the circuit court of appeals held that the orchestra leader was an independent contractor and liable for the unemployment compensation tax. In passing upon this question, the court stated:

"It has been held by this and other courts that employment within the meaning of the Statute connotes the legal

relationship of employer and employee as those terms were defined and understood at the time of the enactment—furthermore, that an independent contractor is not an employee. *Indian Refining Co. v. Dallman,* 7 Cir., 119 F. 2d 417, affirming D. C., 31 F. Supp. 455; *Texas Co. v. Higgins,* 2 Cir., 118 F. 2d 636, and *Jones v. Goodson,* 10 Cir., 121 F. 2d 176. The real question in controversy, therefore, is: Was plaintiff an independent contractor, or an employee of the establishments for which his orchestra performed? If the former, he was the employer of the members of the orchestra and subject to the tax. If the latter, the establishments and not the plaintiff were liable. It follows that if plaintiff was an employee of the establishments, the sidemen were likewise such employees, and that if plaintiff was an independent contractor, the sidemen were his employees and not those of the establishments."

*Aberdeen Aerie No. 24, etc. v. United States,* 50 F. Supp. 734, involved a consolidated action by Aberdeen Aerie No. 24 of the Fraternal Order of Eagles, Ballard Aerie No. 172 of Fraternal Order of Eagles, and by Seattle Aerie No. 1 of the same lodge against Clark Squire, collector of internal revenue of the United States, to recover back taxes alleged to have been illegally assessed and collected. In the Federal case, the question presented was whether employers of an orchestra performing services for the lodge dances held at regular intervals constitute its employees under the provisions of the social security act. It will be noted that the facts in this and the above case are identical. In passing upon the questions presented the court stated:

"We come now to the last issue involved herein, and that is the employment of an orchestra by the Seattle Aerie.

"I shall not endeavor to enumerate all of the elements that exist here, but the undisputed facts and admissions clearly establish the contention of the plaintiff that the orchestras, during the years here involved, supplied music through an independent contractor. It is enough to say that the Aerie itself:

"1. Exercised no right to direct the performance of any individual member of the orchestra.

"2. Had nothing to do with the selection of any individual member.

"3. Was under no legal obligation to pay any wage or salary to any individual member.

"4. Could not discharge any individual member.

"5. Did not even direct the type of music to be played nor furnish such music.

"6. Did not furnish any of the instruments, aside from a piano.

"The facts further disclose that:

"1. The orchestra operated under the name of its leader.

"2. Its services were contracted for with the leader.

"3. All payment for such services was made to the leader.

"The leader was not an employee of the Seattle Aerie, but his status was quite clearly that of an independent contractor, and I so find.

"The case of *Williams v. United States*, 126 F. 2d 129, is decisive of this issue. This case comes from the Seventh Circuit, and reverses the lower court in its decision. The principle announced in this case has been approved in this Circuit, the Ninth, in the case of *Anglim v. Empire Star Mines Co.*, 129 F. 2d 914, and these decisions are binding upon this Court upon this issue, and make the law of this case. The facts in the *Williams* case, supporting the contention that he was an independent contractor, are not nearly so strong as in the case at bar, because there the services were being performed for the use and benefit of strictly commercial organizations, as distinguished from a fraternal organization here.

"It was said in the *Williams* case [126 F. 2d 131], *supra*: 'We think the record discloses without question that the right to hire and discharge was the sole prerogative of the plaintiff.' In this case that right vested solely in the leader of the orchestra and not in the Seattle Aerie. The Treasury regulations under which these assessments are made, Art. 3, Reg. 91, provide: 'In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work, and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not, as to such services, an employee.' The record as made in this case clearly brings the orchestra that furnished music to the Seattle Aerie within this definition."

It is held in *In re Ten Eyck Co.*, 41 F. Supp. 375, that a hotel company with which orchestra directors contracted to furnish music for the hotel patrons' entertainment in consideration of stated lump sums, payable weekly or monthly

to such directors, who had exclusive direction of orchestra members and the sole right to employ and discharge them and was solely responsible for payment of their wages, was not an employer of such members and hence not liable for Federal insurance contributions and unemployment taxes on the wages. The case is analogous to the one at bar relative to the liability of the appellant to a member of the orchestra.

Our attention has been called to the case of *Utah Hotel Co. v. Industrial Comm.*, 151 P. (2d) (Utah) 467, in which the supreme court of Utah held an independent employee and his servants employees under the provisions of the unemployment compensation statute. The facts in the above case are quite similar to those present in the case at bar. However, the only reason given by the Utah court for so holding is by reference to *Singer Sewing Machine Co. v. Industrial Comm.*, 104 Utah 175, 134 P. (2d) 479 (on petition for rehearing in 104 Utah 196, 141 P. (2d) 694). The facts in the *Singer Sewing Machine Co.* case were:

"Briefly, defendant, Winget, entered into a written contract with plaintiff to perform a series of acts, sales and collections in connection with the selling of plaintiff's merchandise, at specified rates of commission. Hereinafter, the plantiff will be referred to as the Company, the defendants as the Commission, and the salesman, respectively. In form, the contract was an agency agreement. It authorized the salesman to hold himself out to the public as duly authorized to effect the sale of the Company's sewing machines and vacuum cleaners and to make collections on accounts entrusted to him. The salesman is not obligated either to make sales or to accept accounts for collection, but his contract was terminable at the will of either party. The Company fixes the net cash price of its new merchandise which must be paid to the Company; sales may be made on title retaining contract basis on forms approved and furnished by the Company, the title being retained by the Company, the sales contract being forwarded to it. The salesman was required to keep the Company advised of addresses of purchasers, and to do anything the Company deemed advisable for the protection of its interest and rights under any credit sale made by him, or account entrusted to him. If the salesman made collections on

these contracts he received a commission on such collections, in addition to his sales commission. If he did not choose to make the installment collections, such were handled from the Company office. New machines sent out to the salesman were consigned and he was required to report weekly the goods he had on hand. The salesman could take in old machines or other matters on the purchase price of new machines at figures to be fixed by himself, but in all cases he had to account to the Company by cash or title contract representing cash for the net cash sale price fixed by it. The 'trade-in' machines were applied on the commissions of the salesman, and became his property. The salesman himself determined the amount of time he devoted to the business of the Company and where he maintained his place of business. He could handle other lines of merchandise for other firms, and could sell his 'trade-in' machines in competition with the Company's new line."

The court held that the salesman was, under the act, an employee of the *Singer Sewing Machine Company*. A comparison of the facts in the two cases illustrates the weakness of the *Utah Hotel Co.* case when applied to the factual situation present here. The Utah court, without giving thought to the differences of facts in the *Singer Sewing Machine Co.* case and the *Utah Hotel Co.* case and, without any real reason, held that the *Utah Hotel Co.* case should be affirmed. The case is not good authority. It does not reflect the weight of authority in the United States.

It is conclusively shown by the evidence in this case that the orchestra leaders were independent contractors and that the musicians were their employees and not employees of appellant.

Having held that the musicians were not employees of appellant, it becomes unnecessary to consider the application of the tests set out in Rem. Supp. 1943, § 9998-119g (5).

The judgment is reversed, with instruction to enter a decree in conformity with this opinion.

MILLARD, STEINERT, ROBINSON, and JEFFERS, JJ., concur.

BEALS, C. J., concurs in the result.

GRADY, J. (dissenting)—I am unable to concur in the majority opinion because I find in it what seems to me to be a departure from the construction we have given to the definition of "employment" by the unemployment compensation act, in that it holds that all independent contractors and those whom they secure to perform services are without the coverage of the act for the reason that there does not exist between them and the one served the common-law relationship of either master and servant or principal and agent, and that it limits the coverage of the act to the latter two relationships.

After the passage of our unemployment compensation act and acts of those of other states containing a similar statutory definition of "employment," the courts divided (and have continued to do so) upon the question as to who were covered by the acts. One school of judicial thought adopted the view that the acts applied only to those who sustained towards each other the common-law relationship of either master and servant or principal and agent, while another adopted a view that it was intended by the lawmakers to, and the statutes defining "employment" did, enlarge the scope of that term, and that it included many individuals who would have been otherwise excluded from the benefits of the acts by the former concepts of master and servant and principal and agent as recognized by the common law. We adopted the latter view in *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568, and continued to do so in many subsequent cases and as recent as *Unemployment Compensation Department v. Hunt,* 22 Wn. (2d) 897, 158 P. (2d) 98.

Shortly after the *McDermott* case, we decided *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718. In that case it was held that newsboys who purchased newspapers from the publisher and resold and delivered them to their customers were independent contractors, and that, as the common-law relationship of master and servant between the publisher and the newsboys did not exist, they were not in employment under the act. The reasoning of

the court was to the effect that the term "employment" covered only the common-law relationship of master and servant.

In a dissenting opinion, attention was called to the conflict with the *McDermott* case. In the light of subsequent events, it is unfortunate that the court did not rehear the case *En Banc* and definitely determine whether the statutory definition of employment, in its broader aspects, should be followed, or whether the restricted view of the extent of that term should be the future rule of decision. The *Recorder* case has never been expressly overruled, but whenever its doctrine has clashed with the doctrine of the *McDermott* case and other subsequent cases, it has either been distinguished or held not to apply, and in some cases members of the court have been reluctant to expressly overrule it in so far as its doctrine conflicted with the other cases. If the *Recorder* case had decided that, inasmuch as the real relationship between the publisher and the newsboys was that of vendor and vendee, as suggested in *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995, the newsboys were not in employment, a correct result would have been reached. What has caused later trouble was the expressions used to the effect that the act covered only those who sustained the relationship of master and servant, and that if one was an independent contractor he was not in employment under the act.

I feel that the effect of the majority opinion is to adopt the doctrine of the *Recorder* case and repudiate that of the *McDermott* case and the long line of cases following it.

An independent contractor and those he may secure to render services are *prima facie* in employment as that term is used in the unemployment compensation act whenever they perform services for remuneration.

Section 19 (g) (1) and (5) (i) (ii) (iii) of the act, Laws of 1937, chapter 162, p. 610, provided as follows:

"(1) 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied. . . .

"(5) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the director that: .

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service."

The factual situation in this case must be gathered from the testimony of the two officers of the appellant who testified. They stated they did not exercise any control over the musicians and did not have any right to do so; but these statements were to a great extent their conclusions and do not negative the fact that, as a legal proposition, the appellant had the *right* of control over them while they were playing for its dances. The fact that appellant may not have exercised any such control, but delegated that duty to another, is immaterial. It was stated that the appellant paid the director and he in turn paid the musicians. The appellant knew that the musicians had to receive the union scale of wages, and the amount of money paid each week included the total of this scale of wages and what the director received for his services. The giving of all of the money to the director was only a matter of clerical convenience to the appellant. The net result was just the same as if the director and each individual musician had been paid directly by appellant. If the director had failed to pay the musicians, they would have had the legal right to have recovered their wages from the appellant. The chief appeal examiner who saw these witnesses and heard them testify was in a much better position to weigh their testimony and draw inferences and conclusions from it than we are.

· We have held many times that the administrative determination of the facts in a proceeding of this kind is conclusive on the courts unless such determination is wholly without evidential support, or is wholly dependent upon a question of law, or is clearly arbitrary and capricious. *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89, and cases cited therein. When the whole relationship of the appellant and the various musicians and their acts and conduct are considered, it seems to me that under the above rule this court should accept the findings of fact and conclusions based thereon of the department.

The services performed by the musicians were not performed for the director or for his benefit. They were performed at the request of appellant and for its benefit, as the music played was necessary in order that the dances could be conducted. All the director did was to select the music and guide the musicians while playing. Both the director and the musicians rendered services within the meaning of the act, and they were performed for wages. This is sufficient to bring all of them within the terms of the act, even though the director may have been an independent contractor under the common-law definition. This being the case, the act applies to the appellant unless the evidence shows that it brought itself within all of the three exceptions above set forth, and the burden was upon appellant to do this to the satisfaction of the commissioner.

It seems clear, as was found by the department, that the directors and musicians were not free from control of the appellant, and that appellant had the right of control over them. The appellant controlled the hours in which their services were required and would have had the legal right to dismiss any musicians whose conduct was improper. The appellant had the right to terminate the services of all of the parties upon giving two weeks' notice; it had control over the times when and the place where the dances were conducted; it owned, maintained, and heated the place where they were held; advertised the dances; sold tickets; received the proceeds therefrom, and controlled the admission of

those who attended the dances. The proceeds from the sale of tickets became a part of the general funds of appellant and were used in promoting its activities. There is no evidence in the record that the directors or musicians furnished or played music for anyone other than appellant. When these factors are all considered, it seems very clear that the appellant has not brought itself within all of the exceptions above set forth.

The form of the questions asked at the hearing before the appeal examiner and the replies given sought to convey the idea that the musicians were serving the director, were paid for their services by him, and were under his exclusive control. The officers of appellant who testified were interested witnesses. We have often held that a trier of fact is not obligated to believe the testimony of an interested witness in its entirety even though it was not contradicted, and may draw inferences from his testimony different from what he may say and arrive at conclusions of fact at variance with such testimony. The trier of fact must interpret the testimony of the witnesses in the light of the whole situation that is unfolded to him, and draw his ultimate conclusions. The appeal examiner did all of this, and after reading all of the record I cannot see how it can be said that the departmental determination that the musicians performed services for wages paid to them by appellant through the musical director, and that appellant did not bring itself within all of the three exceptions above quoted, was wholly without evidential support, or was wholly dependent upon a question of law, or was clearly arbitrary and capricious.

The commissioner, upon review of the decision of the appeal tribunal, reached the same conclusion on the facts as the trial examiner did, and so did the trial judge when the case was heard before him.

It also seems to me that there is a much more simple solution of the question involved here than existed by the approach made to it by the department, and I think it is the theory upon which the parties originally acted. The real situation was that the appellant desired to obtain music for

its dances, and its officers selected and employed someone to find and secure the services of musicians; and that, in whatever they did, the so-called orchestra leaders were nothing more than agents of the appellant; that the agents hired the musicians to render services for it and they were its employees.

The judgment should be affirmed.

BLAKE, J., concurs with GRADY, J.

MALLERY, J., did not participate.

---

GRADY, J.—After the opinion of the court in this case was filed, and before the remittitur was handed down, the appellant filed a motion asking that the court determine the amount of a fee to be paid to its attorney out of the unemployment compensation administration fund.  In the opinion, we held that the appellant was entitled to a refund of unemployment compensation taxes paid by it from March 16, 1937, to June 30, 1942, and reversed a judgment of the superior court which had affirmed the order of the appeal tribunal denying any refund.  The appeal tribunal had affirmed the decision of the commissioner.

It is the contention of the appellant that, in view of Rem. Supp. 1943, § 9998-106(i), it is incumbent upon this court to fix a reasonable attorney's fee to be paid out of the unemployment compensation administration fund for services rendered by its attorney because the decision of the commissioner was reversed.

The pertinent portions of this section are as follows:

"It shall be unlawful for any attorney engaged in any such appeal to the courts as provided herein to charge or receive any fee therein in excess of a reasonable fee to be fixed by the Superior Court in respect to the services performed in connection with the appeal taken thereto and to be fixed by the Supreme Court in the event of an appeal thereto, and if the decision of the Commissioner shall be reversed or modified, such fee and the costs shall be payable

out of the Unemployment Compensation Administration
Fund. In the allowance of fees the Court shall give consideration to the provisions of section 15(b). In other
respects the practice in civil cases shall apply. Appeal shall
lie from the judgment of the Superior Court to the Supreme
Court as in other civil cases. In all court proceedings under
or pursuant to this act the decision of the Commissioner
shall be *prima facie* correct, and the burden of proof shall
be upon the party attacking the same.

"Whenever any appeal is taken from any decision of the
Commissioner to any court, all expenses and costs incurred
therein by said Commissioner including court reporter costs
and attorney's fees and all costs taxed against such Commissioner shall be paid out of the Unemployment Compensation Administration Fund."

. It is the contention of the respondent that Rem. Supp.
1943, § 9998-106(i), in so far as attorney's fees are concerned, does not apply to proceedings for a refund of taxes
paid into the unemployment compensation fund because of
Rem. Supp. 1943, § 9998-114(e), the pertinent portion of
which is as follows:

"The issues raised by such petition shall be heard by
the appeal tribunal, established in section 6 of this act
[§ 9998-106d], in the same manner and in accordance with
the same procedure as is prescribed for appeals from benefit determinations, including the procedure set out in section 6 [§ 9998-106a et seq.] for review by the Commissioner
and court: *Provided,* That the provisions of section 6(g)
[§ 9998-106g] shall not apply to hearings before the appeal
tribunal or appeals to the courts involving assessment disputes, as to such hearings and appeals, the practice in civil
cases shall apply, nor shall the provisions of section 6(i)
[§ 9998-106i] or 15(b) [§ 9998-115b] relating to the fixing
of a reasonable fee for the services of counsel or duly
authorized agents, apply to hearings on assessments or appeals to the courts involving assessment disputes."

▮ In tracing the history of the legislation providing
for attorney's fees under the unemployment compensation act, Rem. Rev. Stat. (Sup.), § 9998-106(i), it will be
found that, in controversies arising over claims for awards
out of the compensation fund, provision was made that it
should be unlawful for an attorney engaged in any appeal

to the courts to charge or receive any fee therein in excess of a reasonable fee to be fixed by the courts in the case. It was also provided that, if the decision of the commissioner should be reversed or modified, such fee would be payable out of the administration fund. Another section of the act, Rem. Rev. Stat. (Sup.), § 9998-114(d) provided that an employer who had paid contributions into the fund might make application for a refund thereof, but no provision was made for attorney's fees in connection therewith. Subsequent legislation on the same subject, chapter 253, Laws of 1941, p. 908, Rem. Supp. 1941, § 9998-114(f), provided the same procedure should be had as prescribed for hearing appeals from benefit determinations, and this is the basis for the argument made that whenever the decision of the commissioner is reversed or modified an attorney's fee shall be allowed.

In considering this aspect of the case, it must not be overlooked that, when the legislature provided for the allowance of attorney's fees, it created a substantive right as distinguished from a procedural remedy, but attached that right only to benefit claims and did not attach it to claims for refund. If there existed any doubt in this respect, it was definitely removed by the proviso to § 10 of chapter 127, Laws of 1943, p. 327, Rem. Supp. 1943, § 9998-114(e), above quoted. The proviso specifically excludes from appeals to the courts involving assessment disputes the provision of the law relating to attorney's fees.

The cases we have decided on the subject of attorney's fees under the unemployment compensation act (*State v. Christensen*, 18 Wn. (2d) 7, 137 P. (2d) 512; *St. Paul & Tacoma Lbr. Co. v. Department of Labor & Industries*, 19 Wn. (2d) 639, 144 P. (2d) 250), considered benefit claims, and the court did not have before it any question of refund. In the case of *In re Jullin, ante* p. 1, 158 P. (2d) 319, 160 P. (2d) 1023, the court had before it a benefit claim, and the question decided was the order of procedure to be taken by the department when such a claim was made. Subsequent to the decision of the case, the court decided that, as a claim for benefits was before the court, the part

of the statute relating to attorney's fees in cases of benefit claims applied, and an award was made. There was no question of refund involved in that case.

We conclude that, in proceedings on appeal from the department involving adjustments of assessments and refunds, attorney's fees to be paid out of the unemployment compensation fund cannot be fixed or awarded by the court.

The motion is denied.

BEALS, C. J., STEINERT, and JEFFERS, JJ., concur.

